UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


HOWARD GAINES,                          )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        No.   4:15 CV 785 JMB
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
        Defendant.                      )


## MEMORANDUM AND ORDER

This cause is on appeal from an adverse ruling of the Social Security Administration.  This suit involves Applications for Supplemental Security Income and Disability Insurance Benefits. The matter is fully briefed, and for the reasons discussed below, the Commissioner's decision is reversed and remanded.  All matters are pending before the undersigned United States Magistrate Judge with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

On November 13, 2012, Plaintiff Howard Gaines ("Plaintiff") filed Applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 et. seq. (Tr. 228-32)[1] and Supplemental Security Income ("SSI") payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq.  (Tr. 220-27)  Plaintiff claimed that his disability began on September 12, 2011, as a result of major depressive disorder and difficulty standing.  On initial consideration, the Social Security Administration denied Plaintiff's claims for

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (ECF No. 14/filed August 17, 2015).

benefits. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 24, 2013. (Tr. 31- 95) Plaintiff testified and was represented by counsel. Vocational Expert Dr. Chrisann Schiro-Geist also testified at the hearing. (Tr. 78-90, 195-213) Thereafter, on January 17, 2014, the ALJ issued a decision denying Plaintiff's claims for benefits. (Tr. 10-25) After considering the representative's brief, the Appeals Council found no basis for changing the ALJ's decision and denied Plaintiff's request for review on April 9, 2015. (Tr. 1-4, 360-63)

Plaintiff filed the instant action on May 18, 2015. Plaintiff has exhausted his administrative remedies and the matter is properly before this Court. Plaintiff has been represented by counsel throughout all relevant proceedings.

In his initial brief to this Court, Plaintiff raises three issues. First, Plaintiff argues that the ALJ erred in giving no weight to his treating doctor, Dr. Rachel Morel. Second, Plaintiff argues that the ALJ erred in relying on vocational expert responses to a hypothetical question substantially different than the Residual Functional Capacity ("RFC") the ALJ formulated. Lastly, Plaintiff argues that the ALJ relied on vocational expert testimony that conflicted with the Dictionary of Occupational Titles ("DOT") or the Selected Characteristics of Occupations ("SCO"). The Commissioner filed a detailed brief in opposition contending that the ALJ's decision is based upon substantial evidence. In his reply brief, Plaintiff argues that the ALJ failed to consider the regulatory factors that apply to weighing a treating physician's opinion; and the ALJ failed to address the alleged conflicts between the vocational expert's testimony and the DOT.

As explained below, the Court has considered the entire record in this matter. Because

the decision of the Commissioner is not supported by substantial evidence, it will be reversed. The undersigned will first summarize the decision of the ALJ and the administrative record. Next, the undersigned will address the issue regarding the ALJ's failure articulate specific reasons for giving no weight to Dr. Morel's opinions.

## II.    Decision of the ALJ

On May 29, 2014, the ALJ issued an adverse decision denying Plaintiff's request for SSI and DIB benefits. The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012. (Tr. 15) The ALJ acknowledged that the administrative framework required him to follow a five-step, sequential process in evaluating Plaintiff's claims. (Tr. 14-15) At step one, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since September 12, 2011, the alleged onset date. (Tr. 15-16) At step two, the ALJ found Plaintiff had the severe impairments of a moderate recurrent major depressive disorder and an anxiety disorder, and the non-severe impairments of low back pain, chronic gastrointestinal problems, breathing problems, hyperthyroidism, vision issues, and medication side-effects. (Tr. 16-17) After considering all of Plaintiff's impairments, severe and non-severe, he found supported by the record, the ALJ gave Plaintiff the benefit of the doubt regarding the numerous alleged impairments he found to be non-severe. The ALJ further concluded, however, that none of Plaintiff's impairments, either singly or in combination, significantly limited his ability to perform basic work-related activities for 12 consecutive months. (Tr. 18-20)

In making his RFC determination, the ALJ found that Plaintiff had the capacity to perform medium exertional work to the extent the following nonexertional capabilities and limitations were

included: no climbing of ropes, ladders, or scaffolds; no exposure to unprotected heights, dangerous moving machinery, or temperature extremes or more than moderate exposure to dust, fumes, low humidity or winds in excess of 10 miles per hour; no sampling or tasting of foods or beverages; doing simple, routine, repetitive tasks; having occasional superficial interaction with co-workers or the general public; and having a reduced stress work environment, defined as having to make occasional commensurate decisions and having no more than occasional changes in routines in a normal work setting. The ALJ explained that medium work involves normal standing and walking abilities, and lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. (Tr. 20)

The ALJ made an adverse credibility finding, concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely credible." (Tr. 23) The ALJ concluded that Plaintiff failed to support his claim of disability with sufficient, relevant evidence. The ALJ summarized his conclusions as follows:

> [Plaintiff's] basic abilities to think, understand, communicate, concentrate, get along with other people, make normal judgments and decisions, adjust to routine work setting changes, and handle normal work stress have never been significantly impaired on any documented long-term basis. There has been no documented serious deterioration in his personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, or behavior patterns over any extended period of time. ... At the hearing, he displayed no obvious signs of depression, anxiety, memory loss, or other mental disturbance.

(Tr. 23) The ALJ found that Plaintiff is unable to perform any past relevant work. The ALJ further found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy he could perform, including an inspector, a packager, and an assembler. (Tr. 24)

III.     **Evidence Before the ALJ**

The administrative record in this matter includes medical records and forms completed by Plaintiff. Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed. The following is a summary of pertinent portions of the record.

A.     **The Hearing Before the ALJ**

The ALJ conducted a hearing on October 24, 2013. Plaintiff was present and represented by an attorney. Also present was a Vocational Expert ("VE"), Dr. Chrisann Schiro-Geist.

1.     **Plaintiff's Testimony**

Plaintiff testified primarily in response to questions posed by his attorney, with additional questions interjected by the ALJ. Plaintiff explained that he selected his onset date of disability, September 12, 2011, because that was the date he started therapy for depression. At the time of his hearing, Plaintiff was fifty years old. (Tr. 39) Plaintiff testified that he used public transportation to come to the hearing. (Tr. 43)

Plaintiff completed over 100 credit hours at a community college with general fine arts as his intended major. (Tr. 47) After Plaintiff had an incident with an instructor, he never returned as he was uncomfortable with the environment. (Tr. 48)

Plaintiff testified that for the prior six months he has lived at the Catholic Charities Places for Fathers, a group home. The residents are required to fill out job applications as a condition of living there. (Tr. 42, 45)

Plaintiff testified that his depression and social anxiety disorder prevent him from going on

job interviews.  (Tr. 46)  Plaintiff testified that he was terminated from a job in 1995 for misconduct, in particular, he had a verbal argument with a coworker.  (Tr. 52)  Plaintiff last worked in the mortgage business in 2011, but a housing problem forced him to leave the job. Before that job, Plaintiff worked as a janitor, a factory worker, a warehouse employee, and an office worker.  (Tr. 45)  According to Plaintiff, he cannot hold down a job because he is unable to cope or deal with groups of people, and is unable to focus and maintain a level of motivation. (Tr. 69)  Plaintiff indicated that he could focus on something for fifteen to twenty minutes and then his anxiety would cause him to lose his concentration and his ability to stay on task.

Plaintiff spends most of the day watching television.  (Tr. 51)  His aunt does his laundry and prepares his food each week.  (Tr. 53-54)  Plaintiff testified that he is unmotivated to do any household chores or to take a shower.  (Tr. 54-55, 57)  Plaintiff testified he is only motivated to talk to his therapist when he feels the need.  (Tr. 67)  Plaintiff has a problem shopping because being around people makes him nervous and causes panic attacks.  (Tr. 58)  Plaintiff takes about a two hour nap every day.  (Tr. 71)

Plaintiff testified that his anxiety causes him problems in social situations and around people.  (Tr. 52)  When Plaintiff is around people he cannot remain focused and loses concentration.  (Tr. 65)  Plaintiff reported conflicts with his family about his homosexuality have caused, in part, his anxiety and depression.  (Tr. 45, 73)

Plaintiff testified that since obtaining Medicaid in December 2012, he has been able to get the medical care he needs, including seeing doctors and receiving medications.  (Tr. 47)  Plaintiff takes Buspirone for his anxiety and Sertraline and Trazodone for his depression, but he testified that the medications help little and cause drowsiness.  (Tr. 62-63)  Plaintiff testified that he is

looking for a primary care physician, and Dr. Rachel Morel is his psychiatrist. (Tr. 68, 72) Ryan

Sosman, his case manager, delivers Plaintiff's medications and tries to motivate Plaintiff. (Tr. 73)

## 2. Testimony of Vocational Expert Dr. Chrisann Schiro-Geist

Vocational Expert Dr. Chrisann Schiro-Geist testified at the hearing. Dr. Geist identified

two jobs she considered to be Plaintiff's past relevant work, a telemarketer and a customer service

agent. (Tr. 80-81) Dr. Geist noted that the customer service agent job has a light exertional level

and is semi-skilled, and the telemarketing solicitor job has a sedentary exertional level and is semi-

skilled. (Tr. 83)

The ALJ asked the VE to assume someone similar to Plaintiff in age, education, and the

same past work experience who is

> capable of performing exertional demands of a reduced range of medium work. The
> lift, carry, push, pull 50 pounds occasionally and 25 pounds frequently. Sit, stand
> walk six out of eight hours each for a combined total of eight out of eight hours.
> There can be no climbing of ladders, ropes, or scaffolds. The individual must avoid
> the hazards of dangerous unprotected heights and dangerous unprotected machinery,
> as well as avoid exposure to extreme heat and extreme cold. And the individual must
> avoid more than moderate exposure to dust, fumes, low humidity, and winds in excess
> of 10 miles per hour. There can be no sampling or tasting of foods or beverages, so
> as not to interfere with the recommended diet. Limit the individual to tasks and
> instructions with an SVP of 2 or less. Limit the individual to occasional superficial
> interaction with the general public; occasional superficial interaction with coworkers;
> and a reduced-stress work environment. And I define that as having to make
> occasional commensurate decisions and no more than occasional changes in routine
> in a normal work setting.

(Tr. 84-85) Dr. Geist opined that, although such hypothetical individual could not perform

Plaintiff's past relevant work, such individual could perform other jobs existing in significant

numbers, including an inspection job (DOT 739.131-018) with an SVP of 2, a packing job (DOT

920.587-018), and an assembly job (DOT 706.687-010) at the medium level. (Tr. 85-86) The

ALJ then asked Dr. Geist to assume the same hypothetical but to add that the individual could not interact with the general public. Dr. Geist explained that the jobs she cited do not require interaction with the public. (Tr. 86)

Next, the ALJ asked Dr. Geist how including a limitation that the individual would be off task 20 to 30 percent of the time during an eight-hour workday would impact the jobs she cited. (Tr. 87) Dr. Geist explained that if an individual was off task to the degree cited by the ALJ, such individual could not perform any of the jobs or any competitive employment.

In response to the ALJ's question regarding the need to lie down, Dr. Geist opined that if the hypothetical individual needed to lie down one time a day for a continuous period of two to three hours, such individual would not be able to sustain competitive employment. (Tr. 88)

Plaintiff's counsel then asked if the hypothetical individual would have to miss work twice a month and either be late or need to leave early twice a month, would the individual be able to perform the jobs she cited. Dr. Geist indicated competitive employment would be precluded.

In response to the ALJ's question about whether the VE's testimony had been consistent with the information contained in the DOT, the VE responded:

> Well, the things that are in the DOT are consistent with my testimony – are consistent with those things that are in the DOT. The DOT doesn't speak to the instances of tardiness and time on task, et cetera. But I have gained that information by being a diplomat of the American Board of Vocational Experts and my own observations of work and interacting as a professional.

(Tr. 89) The VE opined that she based her determination regarding Plaintiff's ability to adjust to other work on her education, training, and experience. (Tr. 89-90)

B.    **Forms Completed by Plaintiff**

In a Work History Report form, Plaintiff reported having worked as a customer service

representative for Home Delivery Incontinent Supplies, from April to July, 2011, and for

ADECCO Temp, from October 2010 to April 2011.  (Tr. 259)  Both jobs required Plaintiff to call

doctor's offices and request forms for customers.  (Tr. 261-62)  In his last job at the Bridge

Outreach, from September through December 2009, Plaintiff reported that this his duties included

greeting guests.  (Tr. 264)

In a Function Report - Adult form, completed on November 13, 2012, Plaintiff listed

attending meetings at St. Patrick's Center and attending group therapy every day as some of his

daily activities.  (Tr. 268)  Plaintiff reported that his meals were prepared at the shelter, and he

does basic cleaning and laundry.  (Tr. 269)  Plaintiff reported being able to use public

transportation and being able to go out alone.  (Tr. 270)

C.    **Medical Records and Source Opinion Evidence**

1.    **General History**

The medical evidence in the record shows that Plaintiff has a history of depression, anxiety

disorder, diabetes, and mild hyperopia.  (Tr. 365-626)  Although the Court has carefully

considered all of the evidence in the administrative record in determining whether the

Commissioner's adverse decision is supported by substantial evidence, only the medical records

relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

The relevant medical evidence will be discussed in more detail below, as part of the Court's

analysis of the arguments raised by Plaintiff herein.

2.    **Grace Hill - Dr. David Richards** (Tr. 374-442, 564-76)

Between November 30, 2010, and April 26, 2013, Dr. David Richards treated Plaintiff at

Grace Hill.

On November 30, 2010, Plaintiff presented with diabetes. In follow-up treatment on December 2, 2010, Plaintiff reported that he had a history of depression and he had been taking Zoloft but he stopped taking Zoloft a year earlier without experiencing any issues. Examination showed Plaintiff's affect to be normal. Plaintiff requested to restart Zoloft.

On December 13, 2011, Plaintiff presented with anxiety and depression and requested Zoloft. In follow-up treatment on April 9, 2012, Dr. Richards refilled Plaintiff's Zoloft prescription.

During treatment on August 23, 2012, Plaintiff reported experiencing a depressed mood, fatigue, loss of energy, and poor concentration, but he admitted having run out of Zoloft several months earlier. (Tr. 374) Dr. Richards' examination showed Plaintiff had a depressed affect but that he was not anxious. Dr. Richards made the diagnosis of depressive disorder and prescribed Zoloft. Dr. Richards noted Plaintiff had symptoms of a major depressive episode on September 10, 2012. Plaintiff reported having financial worries stemming from unemployment starting in July 2010. On October 8, 2012, Plaintiff admitted that he stopped taking Zoloft two weeks earlier. Dr. Richards observed Plaintiff not to have any unusual anxiety or evidence of depression and resumed Plaintiff's Zoloft. In follow-up treatment on November 14, 2012, Dr. Richards doubled Plaintiff's Zoloft dosage and added Buspar and found his mental complaints stem in part from hyperparathyroidism.

On March 26, 2013, Plaintiff returned and requested a letter of disability for his psychiatric issues and reported feeling better on medications. Dr. Richards advised Plaintiff "to talk to BJ about disability letter" and noted the medications helped Plaintiff's anxiety. In follow-up treatment on April 26, 2013, Dr. Richards found Plaintiff to be alert and oriented with no unusual

anxiety or evidence of depression and to be stable on Zoloft.

### 3. BJC Behavioral Health Services - Dr. Rachel Morel (Tr. 444-68, 579-92)

Between November 14, 2012, and July 19, 2013, Dr. Rachel Morel, a D.O. board certified in psychiatry, treated Plaintiff at BJC Behavioral Services. A report regarding Plaintiff dated November 14, 2012, lists major depressive disorder and anxiety disorder.[2]

On November 20, 2012, Anita Tsay, a clinician, evaluated Plaintiff on referral by Shelter Outreach Services. Plaintiff reported wanting to start his own business. Plaintiff indicated that he adapts well to change. Plaintiff reported depression, inability to focus, and his mood swings as his main barriers, and homelessness and lack of income as his other stressors. Plaintiff also reported an ongoing pattern of life struggles such as problems maintaining employment, isolation from others, and difficulty connecting to his art. Since becoming homeless, Plaintiff reported developing severe anxiety symptoms when around other people. As a result, Plaintiff avoids social situations because these trigger panic attacks. When Plaintiff became homeless, he dropped out of school. Plaintiff attends AA meetings at St. Patrick's Center despite not having any alcohol issues. Plaintiff explained that he is now seeking psychiatric care after a long period of time of trying to deal with stressors on his own. Ms. Tsay observed Plaintiff's affect to be depressed. Ms. Tsay assessed Plaintiff to have a GAF score of 45, and diagnosed him with major depressive disorder and anxiety. Ryan Sosman, a case manager, helped formulate Plaintiff's "Integrated Recovery Plan."

On December 14, 2012, Plaintiff met with Dr. Morel to establish care for major depressive

---

[2]The undersigned notes that the medical record from BJC BH Community Mental Health Center appears to be incomplete because the only record dated November 14, 2012, is the one-page report styled as "DX Summary Report." (Tr. 445)

disorder, anxiety disorder, and panic disorder. Plaintiff reported being homeless and receiving psychiatric care through his primary care physician since 2004. Plaintiff reported that he had been struggling with anxiety and depression and he wanted to transfer his care from his primary care physician. Plaintiff reported taking Trazdone and Zoloft, with his dosage recently increased. Plaintiff described the frequency of his depression "as more episodic as it has affected his ability to finish school and hold a job." (Tr. 447) As to his anxiety, Plaintiff reported having trouble in crowds but he no longer had panic attacks when out in public. Dr. Morel's psychiatric evaluation showed Plaintiff's mood to be okay, his affect restricted, his thought process goal directed and logical, and his insight and judgment to be fair. Dr. Morel noted that Plaintiff was well groomed with fair eye contact. Dr. Morel continued Plaintiff's medication regimen and supportive therapy.

Plaintiff returned for follow-up treatment on January 4, 2013, and reported he had decompensated since the last visit due to relationship issues. Dr. Morel increased his Zoloft dosage to 150 milligrams. In follow-up treatment on January 25, 2013, Plaintiff denied having any panic attacks since his last visit. Plaintiff decided to limit his activities and not attend group therapy to avoid his ex-boyfriend. Dr. Morel found Plaintiff's depression to be stable on Zoloft but his anxiety worsened after a recent relationship breakup.

On April 12, 2013, Plaintiff reported increased stress and irritability after finding out that he might be homeless again. Dr. Morel noted Plaintiff to be well groomed with fair eye contact, and his insight and judgment to be fair. Dr. Morel increased Plaintiff's Zoloft dosage and encouraged Plaintiff "not to isolate as this could make it harder for him to venture out when he is feeling better." (Tr. 581) On April 26, 2013, Plaintiff reported increased anxiety after finding out he has to be completely homeless before he is eligible to live in another shelter. Plaintiff indicated

that "[h]is lawyer is unsure if it is a good idea for him to get even a part time job to try to survive as it may jeopardize his case." (Tr. 583) Dr. Morel continued Plaintiff's medication regimen for depression and anxiety.

In follow-up treatment on June 7, 2013, Plaintiff described his mood as better and his depression improved. On July 19, 2013, Plaintiff reported still having issues from his last relationship and being interested in going to the Independence Center as a social outlet. Dr. Morel assessed a GAF score of 48.

Dr. Morel completed a three page "Mental Medical Source Statement" ("MMSS"), dated July 31, 2013, at the request of Plaintiff's counsel. In that MMSS, Dr. Morel found Plaintiff had no ability to function independently, to behave in an emotionally stable manner or to adhere to basic cleanliness standards, to relate to family or peers, or to maintain socially acceptable behavior. Dr. Morel found Plaintiff could perform in a task-oriented setting where he has casual and infrequent contact with coworkers and the general public, with supervisors providing simple instructions for non-detailed tasks. Dr. Morel also noted that Plaintiff's overall pace of production would be 31% or more below average, and he would miss work twice a month; and he would either be late or have to leave early twice a month.

### 4. St. Patrick's Center (Tr. 479-533)

Starting in February 2002, Plaintiff received mental health services such as group counseling/therapy, and substance abuse education at the St. Patrick's Center.

### 5. Catholic Family Services, Places for Fathers - D. Carter (Tr. 601-16)

Between May 29, 2013, and August 28, 2013, Plaintiff attended eight therapy sessions with D. Carter, MSW (masters social work), LCSW (licensed clinical social worker) at Catholic

Family Services, Places for Fathers. On May 13, 2013, Plaintiff discussed his upcoming art work display and wanting to participate in activities to improve his social interactions. Mr. Carter assessed Plaintiff and found him to have a GAF score of 65. On May 19, 2013, Plaintiff reported that although he lacks energy to participate in activities, he wants to begin attending sessions at the Independence Center. During follow-up treatment on July 25, 2013, Mr. Carter recommended Plaintiff seek follow-up treatment with his psychiatrist and provided him with a crisis hotline number. On August 28, 2013, Plaintiff reported having difficulty interacting with others and being unable to follow-up with psychotropic medications.

In a letter dated October 30, 2013, Rhondell McGuire, a senior program case manager, explained that the program is "designed to provide permanent supportive housing and services to chronically homeless men with a disability. Mr. Gaines met all HUD requirements and is currently a resident in our program ... Catholic Family Service Places for Fathers Plus." (Tr. 616)

## IV. <u>Standard of Review and Analytical Framework</u>

To be eligible for Supplemental Security Income ("SSI") or Disability Insurance Benefits ("DIB"), Plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). Additionally, a claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If he is, then he is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, he is not eligible for disability benefits. If the claimant has a severe impairment, the ALJ proceeds to step three and determines whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed, or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed, or is not the equivalent of a listed impairment, the ALJ proceeds to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five to determine whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will he be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the claimant's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the

available "zone of choice" defined by the evidence of record. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. <u>Id</u>.; <u>see also</u> <u>McNamara v. Astrue</u>, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## V.  **Analysis of Issues Presented**

The broad issue in this case is whether the final decision of the Commissioner is supported by substantial evidence on the record as a whole. In his brief before this Court, Plaintiff contends that the ALJ committed reversible error when: (1) the ALJ gave no weight to the opinion of Dr. Rachel Morel, his treating psychiatrist; (2) the ALJ relied on vocational testimony based on hypothetical questions that were substantially different than the RFC; and (3) the ALJ relied on vocational expert testimony that conflicted with the DOT. As explained below, because the Court finds the ALJ erred in articulating his reasoning in giving no weight to the opinions of Plaintiff's treating physician, Dr. Morel, the Court will only address this issue.

Plaintiff argues the ALJ erred in weighing the opinion of Dr. Morel, his treating doctor, by failing to offer "a basis to give the opinion non-substantial weight." (ECF No. 19, at *1)  In support of the ALJ's decision, the Commissioner contends that, although the ALJ did not discuss the elements of 20 C.F.R. § 416.927(c)(1)-(2) "at any one place in his written decision[,] [h]is discussion of those elements is spread across his written decision and wrapped up mostly in his

consideration of the credibility fo Plaintiff's complaints."[3]  (ECF No. 18, at \*5)

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources.  See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).  However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).  The treating physician's opinion should be given controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques.  Hacker v. Barnhart, 459 F.3d 935, 937 (8th Cir. 2006).  See also 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (listing "[s]upportability" as a factor to be considered when weighing medical opinions).

Inconsistencies may diminish or eliminate the weight given to an opinion.  Hacker, 459 F.3d at 937.  See also Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or is inconsistent with the record'") (quoting Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007)).  "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  Papesh, 786 F.3d at 1132 (quoting Samons, 497 F.3d at 818).  An ALJ "may discount or even disregard the opinion ... where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  Id., 786 F.3d at 1132 (quoting Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015)).

---

[3]The undersigned notes that Defendant did not include any page citations to the ALJ's written opinion in support of this assertion.

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c), at *5 (requiring the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)"). Whether the ALJ grants a treating physician's substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)). "Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand." Anderson v. Barnhart, 312 F.Supp.2d 11876, 1194 (E.D. Mo. 2004). See also Tilley v. Astrue, 580 F.3d 675, 680-81 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000).

Dr. Morel was Plaintiff's treating doctor when she completed the three page "Mental Medical Source Statement" ("MMSS"), dated July 31, 2013, setting forth her opinions as to Plaintiff's limitations. In the MMSS, Dr. Morel concluded that Plaintiff "[c]ould perform in a task-oriented setting where contact with coworkers is only casual and infrequent ..., in a setting where supervisors provide simple instructions for non-detailed tasks ..., [and] in a setting where contact with the general public is only casual and infrequent." (Tr. 590) Dr. Morel also noted that Plaintiff's overall pace of production would be 31% or more below average, and he would miss work twice a month; and he would either be late or have to leave early twice a month. Dr. Morel assessed a GAF score of 48.

In his written decision, the ALJ assessed Dr. Morel's MMSS as follows:

> The undersigned gives no weight to the opinion by Dr. Morel, who was only one of many providers who saw the claimant at BJC [on April 26 and July 19, 2013], and who just happened to be the most recent one. Her check-off form[4] findings, including a GAF of only 48 are inconsistent with those of Mr. Carter, who indicated both before and after the date of Exhibit 9F that the claimant's GAF was only a mildly restrictive 65.

(Tr. 22)

A review of the ALJ's decision shows the ALJ neither applied the factors as required, nor provided sufficient reasons for giving no weight to Dr. Morel's opinions. In completely discounting the opinions in Dr. Morel's MMSS, the ALJ did not adhere to the factors identified in 20 C.F.R. §§ 404.1527(c), 416.927(c). It appears that the ALJ only partially considered one factor – the consistency of Dr. Morel's opinion regarding Plaintiff's GAF score relative to the GAF scores determined by another provider. The ALJ did not identify any other inconsistencies or bases for completely rejecting Dr. Morel's opinions.

Additionally, the ALJ incorrectly concluded that Dr, Morel treated Plaintiff only twice, on April 26 and July 19, 2013. In fact, the record shows Dr. Morel treated Plaintiff on December 4, 2012, January 4, 2013, January 25, 2013, April 12, 2013, and June 4, 2013.[5] See (Tr. 579-88)

_____

[4]The fact that Dr. Morel's MMSS was a checklist with no narrative explanation does not entirely diminish the probative value of her opinions and treatment records. That would be a basis for giving Dr. Morel's MMSS less than controlling weight, not for discounting it altogether. See Samons, 497 F.3d at 818.

[5]Although not raised by the parties, the undersigned notes that another problem is the ALJ's failure to consider all the evidence in a case, especially medical evidence from a treating physician. Reeder v. Apfel, 214 F.3d 984, 987-88 (8th Cir. 2000) ("the ALJ is not free to ignore medical evidence but rather must consider the whole record"); see also 20 C.F.R. §404.1520(a)(3) ("we will consider all evidence in your case record when we make a determination or decision whether you are disabled"). Where an ALJ does fail to consider all the evidence, that can be reversible error. See Reeder, 214 F.3d at 988 (where the ALJ's opinion "appears to have ignored some of the medical evidence" it will be remanded).

Moreover, the ALJ incorrectly assumed that other providers at BJC Behavioral Services were physicians or providers of equivalent status to Dr. Morel. In fact, the record shows Dr. Morel was the only physician at BJC Behavioral Services treating Plaintiff –Ms. Tsay was a clinician and Mr. Sosman was a case manager.

Although the ALJ considered the GAF score of 65 by Mr. Carter to discredit Dr. Morel's MMSS, the Court believes that the ALJ's analysis of the weight due to Plaintiff's GAF scores is flawed for a number of reasons. First, as noted by Plaintiff, Mr. Carter is not an acceptable medical source, see 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing such sources, which did not include someone with a MSW, LCSW), and his only source of information for the assessment was Plaintiff. See Vester v. Barnhart, 416 F.3d 886, 890 (8th Cir. 2005) (rejecting licensed professional counselor's assessment that claimant's disability was caused by mental health issues and not alcoholism - counselor was not acceptable medical source). The ALJ also failed to explain how he compared, contrasted and dismissed the differences in Plaintiff's GAF scores, which indicates an improper determination of a lesser limitation in functioning. See Span ex rel. R.C. v. Barnhart, 2004 WL 1535768, at *9 (E.D. Pa. May 21, 2004) (ALJ's determination of a claimant's level of function was not supported by substantial evidence because of the ALJ's failure to explain how he weighed and discounted the significance of the claimant's score). Thus, the undersigned finds that the ALJ improperly used Mr. Carter's GAF score as a basis to completely discount Dr. Morel's opinions in the MMSS.

As noted above, the ALJ also missed or disregarded several months of treatment records from Dr. Morel, who was Plaintiff's treating physician during this time. Accordingly the Court finds that the ALJ failed to provide sufficient reasons for giving no weight to Dr. Morel's

opinions.  This is an issue for the ALJ, not the Court, to address in the first instance.  See Pfitzner
v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999)

Even if the ALJ had identified good reasons for discounting Dr. Morel's MMSS, as a
treating physician, absent very good reasons, her opinions should still have been entitled to some
weight.  See Papesh, 786 F.3d at 1132-33; Samons, 497 F.3d at 818 ("Even if the opinion is not
entitled to controlling weight, it should not ordinarily be disregarded....").

Moreover, Dr. Morel's opinions were not inconsistent with the record as a whole or her
treatment notes.  For example, the medical records show that Plaintiff received treatment for
depression and anxiety before his alleged onset date.  During treatment on July 25, 2013, Mr.
Carter recommended Plaintiff follow-up with his psychiatrist and provided Plaintiff with a crisis
hotline number.  In the last session on August 28, 2013, Plaintiff reported having difficulty
interacting with others and being unable to follow-up with psychotropic medications.

Although it is possible that the ALJ will come to the same ultimate conclusion on remand,
Plaintiff correctly argues that the Court cannot uphold the ALJ's decision by citing factors not
relied on by the ALJ, citing Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001), as support.
"[A] reviewing court may not uphold an agency decision based on reasons not articulated by the
agency," when "the agency [has] fail[ed] to make a necessary determination of fact or policy"
upon which the court's alternative basis is premised.  Id. (alteration in original; citation omitted).
Here, the ALJ failed to consider the 20 C.F.R. § 404.1527 factors.  Id.

On remand, the ALJ should apply the factors as required by 20 C.F.R. §§ 404.1527(c),
416.927(c), and articulate specific reasons for the weight given (if any) to Dr. Morel's opinions.
See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (noting "inaccuracies, incomplete

analyses, and unresolved conflicts of evidence" are proper basis for remand).

## VI.    Conclusion

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and free of legal error.  Papesh, 785 F.3d at 1131.  Where an ALJ fails to properly consider opinion evidence of record, it cannot be said that the resulting RFC determination is supported by substantial evidence on the record as a whole.  Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001).  In the instant case, the ALJ failed to properly evaluate Dr. Morel's opinion and misstated the record when evaluating that opinion.  The matter will therefore be remanded for further consideration.

Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all the evidence of record and undergoing the required analysis, the determination is nevertheless one that the Commissioner must make in the first instance.  See Pfitzner, 169 F.3d at 569.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **REVERSED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this 19th day of August, 2016.

                                        /s/ John M. Bodenhausen
                                        JOHN M. BODENHAUSEN
                                        UNITED STATES MAGISTRATE JUDGE